Yerxa, Andrews & Thurston v. Randazzo Macaroni Manufacturing Company, Appellant.

Division One, October 11, 1926.

1. **ACTION IN THIS STATE: Foreign Corporation: Interstate Commerce.** A contract involving interstate commerce and relating to interstate business is enforceable in the courts of this State. A foreign corporation which, without having procured a license or certificate from the Secretary of State to do business in this State, manufactures flour in another State and ships it under contract of sale to a corporation in this State, and has no office or stock of goods or employees in this State, the said contract having been signed in this State and procured by a broker who sold the flour upon a commission basis and received no other compensation, can maintain a suit in the courts of this State against the vendee for damages growing out of a breach of said contract.

2. **AMENDING ANSWER: Discretion: Abuse: Long Delay and Expense.** By virtue of the statute (Sec. 1274, R. S. 1919) declaring that the court may at any time before final judgment, and in furtherance of justice "and on such terms as may be proper," amend any pleading by inserting other allegations material to the case, etc., the trial court should be liberal in allowing amendments in furtherance of justice, but may exercise a reasonable discretion in allowing or denying amendments, and particularly so when they are offered out of time or during the course of the trial. Where the defendant filed an amended answer more than ten months after the petition was filed and the action was commenced, and two weeks after the issues were thus joined the parties went to trial, and on the second day of the trial defendant asked permission to amend the answer so as to allege that the defendant could not read the terms of the contract sued on and relied solely upon the representations of plaintiff's agent, and the court announced that the request would be denied unless defendant paid the hotel and traveling expenses of plaintiff's witness and counsel, who had come from a distant city, and defendant refused to pay the expenses because they were not taxable as costs, and on the next day, after plaintiff had closed its case in chief, defendant again asked so to amend the answer and offered to submit to the terms announced by the court on the preceding day, the court did not abuse its discretion in denying either of said requests to amend.

3. **CONTRACT: Unilateral: To Mill, Ship and Buy Flour: Mutuality: Equal Remedy.** There must be mutuality of obligation and remedy in every valid contract; but that does not mean that the contract must afford the same remedy to each party. Their obligations need not be equal, and privileges granted to one which are not given to the other do not destroy mutuality, but the test is whether the contract contains mutual promises and imposes mutual obligations. A contract which obligates a milling company to manufacture and deliver to the defendant, a manufacturer of macaroni and spaghetti, three thousand barrels of flour of a designated quality, within three designated months, at $9.75 per barrel, in such quantities and at such times as defendant may direct, and which obligates defendant buyer to order out and take and pay for the flour at the agreed price, is not unilateral, but its consideration is mutual promises and mutual obligations, although it contains numerous other incidental and collateral conditions and provisions.

4. **GAMBLING CONTRACT: Based on Current Market Price of Wheat.** The object and purpose of a contract for the manufacture, sale and de-

livery of flour of a designated quality are not unlawful or against public policy, since flour is a lawful commodity; and in the absence of evidence to the contrary it must be presumed that the parties entered into the contract with the intention of performing it and of carrying out the mutual obligations imposed by it, and it cannot be held to be a gambling contract on the ground that the price of the flour was based on the current price of wheat·on a grain exchange and that plaintiff purchased the wheat on option, to be delivered, when needed, upon cash payment.

5. SALES CONTRACT: Successive Extensions: Unilateral: Unreasonableness. A provision for extending the life of a contract for the sale of flour for successive periods of thirty days, and for as many such successive extensions as the seller may desire, is not unilateral or unreasonable, where the buyer can stop all extensions by directing the seller to ship, or where the contract further provides that the buyer may notify the seller that he will not perform the contract or may request its cancellation and thereupon the seller will be entitled to only one more extension; and especially so where the buyer has acquiesced in or requested the extensions made.

6. COMPLEX CONTRACT: Small Type: Obscurity. A written contract cannot be held void on the ground that it is complex in its terms and conditions and is printed in small type closely spaced. No person is obliged to enter into such a contract, and it is the duty of each party to himself and to the other to know its contents before he signs it.

7. MEASURE OF DAMAGES: Breach of Sales Contract: Agreement for Liquidated Damages: Penalty to Discourage Breach: How Ascertained. No hard-and-fast general rules can be laid down, as applicable to all concontracts, on the question whether the sum, or method of calculating the sum, named in a contract of sale to be paid by the defaulting party upon its breach, is to be considered liquidated damages or merely a penalty. The question is to be determined by the contract, fairly construed, and in arriving at a determination the intention of the parties must be sought from a consideration of the contract as a whole, the situation of the parties, the subject-matter of the contract, and all the circumstances surrounding its execution, together with the ease or difficulty of measuring the breach in damages, and the magnitude of the stipulated sum, not only as compared with the value of the subject of the contract, but in proportion to the probable consequences of the breach. And neither the name given by the parties to the sum specified in the contract, nor the particular words used, are conclusive as to whether they intended to provide for liquidated damages or for a penalty.

8. ———: ———: ———: ———: Sale of Flour to be Manufactured. The parties contracted for the manufacture by the seller and the sale to the buyer of three thousand barrels of flour, of a designated brand and quality, to be milled from wheat of a designated grade and color, within three designated months, and to be delivered at such times and in such quantities as the buyer might direct, at $9.75 per barrel. The buyer directed the delivery of and paid for 970 barrels, and about six months after the date of the contract breached it as to the balance. The contract provided that, if the buyer breached it, the "seller shall recover as liquidated damages: (a) a sum equal to four cents multiplied by the number of bushels of wheat required to make such unshipped flour, figuring four and three-fourths bushels to the barrel of flour; plus (b) a sum equal to three cents multiplied by the said number of bushels, which sum shall be calculated for each thirty days intervening between date hereof and date of breach; plus (c) amount of decline, if any, per bushel, multiplied by said number of bushels, from date hereof to date of breach, in highest closing price, at Minneapolis, of such wheat." The contract further provided that "this is a contract to sell, by description, goods to be manufactured." Held that, as the

contract related to flour to be subsequently manufactured, and the sale price of the flour was based on the market price of wheat when the contract was made, and as the parties necessarily contemplated the future purchase of the wheat from which the flour was to be made, and as the price of wheat might rise or fall from day to day during the life of the contract, the parties had the unquestionable right to agree upon some reasonable method of determining their respective damages in the event of a breach of the contract by either, and said clause does not indicate that the sum to be calculated in the way it prescribes was intended to be a mere penalty to discourage a breach, but was a valid agreement for liquidated damages and fixed the measure of the seller's recovery.

9. **COUNTERCLAIM: Acceptance of Goods Sold: Conditions Precedent to Damages for Defects or Defaults.** Clauses in the contract providing that acceptance of the flour shipped thereunder shall estop the buyer from claiming damages, misrepresentations, fraud, defect in quality, or other breach or default, and that the whole of any such shipment shall be deemed to have been accepted by the buyer, if he fails to report such defect, breach or default to the seller's office, by registered mail over his signature, within ten days after receipt of shipment and payment of draft, or fails to send to the seller's office, by express, within such ten days, a five-pound · sample of flour claimed to be defective or inferior, or if he fails to transmit to the seller's office, by registered mail, a signed, verified and itemized statement of damages claimed within thirty days after receipt of a shipment, are conditions precedent to be observed and performed by the buyer, and in order to recover on his counterclaim to the seller's suit for damages for a breach the buyer must either show a compliance with them on his part, or a waiver of a compliance with them by the seller; and where he pleads neither compliance nor waiver, he is not entitled to introduce evidence in support of his counterclaim.

10. **SALE: Severable Installments: Some Inferior: Breach as to Rest: Instruction.** No principle of law prevents the parties from agreeing that a contract of sale shall be severable as to each installment of goods to be shipped or delivered thereunder, and hence it is not error to instruct the jury on behalf of the seller that "even if you find and believe that the 970 barrels of flour actually delivered to the buyer were not of a quality called for by the contract, nevertheless that fact did not of itself justify the buyer in refusing to take and pay for the remaining 2030 barrels called for by the contract," where the contract provided that "this contract shall be severable as to each installment of goods shipped or stipulated herein to be shipped, nor shall the seller's breach or default as to any installment give the buyer the right to refuse any other installment."

11. ———: **Conditions Printed on Back of Contract: Misrepresentations: Reliance.** It is not error to exclude the buyer's offered testimony in defense to the seller's suit for damages for a breach of a contract of sale, that the seller's broker at the time the contract was signed stated to the buyer that "the printed matter on the back of the contract was not a part of the contract, but was the rules and regulations" of the seller, where the buyer's proof does not show that he relied on the statement or acted thereon, or that the broker said or did anything to prevent or to dissuade the buyer from reading the contract before he signed it, and a duplicate copy was left with the buyer and there is no evidence that he complained that the contract was procured through misrepresentation or fraud on the part of either the seller or said broker. The offer was insufficient to show fraudulent intent, or reliance on the statement if made.

12. ———: **Notice of Inferiority: Carbon Copy of Letter.** Where the contract of sale provided that all defects in the goods shipped should be reported to the seller by registered mail and that samples of goods claimed to be inferior or defective must be sent to the seller by express, the buyer,

315 Mo.—59.

when sued for damages for breaching the contract, is not entitled to introduce in evidence a carbon copy of a letter which he claims was addressed to the seller and deposited in the mails, acknowledging the delivery of the first shipment of flour and complaining of its quality and stating he was sending a one-pound sample for inspection, unless he proves that the letter was registered and that the sample was sent by express, or unless the seller admits that he received either the letter or sample, or the buyer produces substantial evidence that the seller did receive them.

13. ———: **Modification of Contract: Separable Installments.** Where the contract provided for the sale of three thousand barrels of flour designated as "Semolina," and the buyer received and paid for 970 barrels, and the seller sues for damages for the buyer's refusal to accept the remaining 2030 barrels, the inclusion of Three Star (instead of Two Star) Semolina in one shipment of three hundred barrels accepted, was not a modification of the contract, where it provided that it was severable as to each installment shipped. In such case the original contract stands unmodified as respects the remaining 2030 barrels unshipped at the time of the breach, and that original contract is the basis of the seller's recovery, and it by its terms is unaffected by any modification of the separable installment previously shipped.

Corpus Juris-Cyc. References: **Appeal and Error,** 4 C. J., Section 2757, p. 800, n. 40; Section 2853, p. 876, n. 78. **Commerce,** 12 C. J., Section 25, p. 27, n. 93. **Contracts,** 13 C. J., Section 179, p. 333, n. 23, 31; Section 249, p. 370, n. 25; Section 366, p. 427, n. 51. **Damages,** 17 C. J., Section 233, p. 934, n. 52, 53, 54, 55; Section 234, p. 935, n. 61; p. 936, n. 66; p. 937, n. 67, 68. **Gaming,** 27 C. J., Section 271, p. 1054, n. 41; Section 354, p. 1100, n. 74. **Pleading,** 31 Cyc., p. 385, n. 57; p. 401, n. 94. **Sales,** 35 Cyc., p. 88, n. 43; p. 127, n. 56; p. 222, n. 96; p. 619, n. 65. **Trial,** 38 Cyc., p. 1350, n. 3.

Transferred from St. Louis Court of Appeals.

AFFIRMED.

*Henderson, Stevens & Henderson* for appellant.

(1) The amendment of the answer should have been allowed by the trial court, (a) without requiring the defendant to pay the expenses of Hoidale and Zerxa while in St. Louis, together with their railroad fare from Minneapolis to St. Louis and return, and (b) the amendment should have been allowed at the beginning of defendant's case after defendant had offered to comply with the terms imposed upon defendant. Corrigan v. Brady, 38 Mo. App. 649, 154 Mo. App. 600; State ex rel. Mackey v. Thompson, 81 Mo. App. 549; Mutual Ins. Co. v. Bauman, 14 Mo. 74; Long v. Overton, 7 Mo. 567; Pomeroy v. Browne, 19 Mo. 303; Dozier v. Jerman, 30 Mo. 216; Ensworth v. Barton, 67 Mo. 622; Lottman v. Barnett, 62 Mo. 159; Archer v. Ins. Co., 43 Mo. 434; Martin v. Martin, 27 Mo. 227; Chauvin v. Lounes, 23 Mo. 223; Hannan v. Logan, 14 Mo. App. 33; McClanahan v. Boggers, 154 Mo. App. 600; Ser. v. Bobst, 9 Mo. 28; Reyburn v. Mitchell, 106 Mo. 365; Clarkson v. Morrison, 24 Mo. 134; Caldwell v. McKee, 8 Mo. 334; Dallman v. Bowman, 16 Mo. 225. (2) The contract was made with a foreign corporation doing business in the State of Missouri without a license, and is void. R. S. 1919, secs. 9792, 9793; Tri-State Amusement Co. v. Amusement Co., 192 Mo. 404; Mill v. Sims,

197 Mo. 597; Roeder v. Robertson, 202 Mo. 522; United Shoe Mch. Co. v. Ramlose, 210 Mo. 263, 231 Mo. 508; Zinc Co. v. Zinc Co., 221 Mo. 7; Cement Co. v. Gas Co., 255 Mo. 1. Contracts to be performed in Missouri are void even though signed in some other state. United Shoe Mch. Co. v. Ramlose, 231 Mo. 655. (3) The extension of the contract to April 1, 1921, caused defendant an unreasonable loss. St. Clair v. Hellwig, 173 Mo. App. 660; Royal Brew. Co. v. Uncle Sam Oil Co., 205 Mo. App. 616. (4) If plaintiff suffered a loss by failure of defendant to give shipping instructions, the damages suffered, if any, could have been ascertained with reasonable certainty; therefore, the liquidated damages were a penalty and as such unenforceable. Johnson Co. v. L. H. & P. Co., 188 Mo. App. 157; Werner v. Finley, 144 Mo. App. 554; Muhlbach v. Ry. Co., 166 Mo. App. 305. (5) Where no right of inspection exists before accepting goods and paying for same, the law implies that the article sold shall be as specified in the contract. Benjamin on Sales (8 Ed.) 646. (6) Testimony that the goods shipped was not Two Star Semolina flour as provided in the contract was admissible, and excused defendant from furnishing further shipping instructions as to the remainder of the flour contracted for. Ungerer & Co. v. Cheese & Fish Co., 155 Mo. App. 95; Elevator Co. v. Danzero, 189 Mo. App. 161; Stiz v. Brewers Refrig. Co., 141 U. S. 510; Mark v. Cooperage Co., 204 Mo. 242, 264; Hendry v. McPhee, 11 Colo. App. 398; Louisville Lith. Co. v. Schedler, 63 S. W. 8. (7) In the absence of a motion to make more definite and certain the defendant, under its answer, was entitled to show fraud in the procurement of the contract as to the unsigned printed matter on the back thereof. (8) It is a question for the jury, and not one of law for the court, to determine whether notice of defects were given as required by the contract. McCormick Harvesting Mach. Co. v. Brower, 55 N. W. 537. Or whether waived by seller. Buchanan v. Labor, 81 Pac. 911. (9) The burden of proving whether the goods delivered complied with the contract was on plaintiff, and having pleaded and offered evidence thereon, the buyer is entitled to prove the contrary. McCall Co. v. Jacobsen, 139 Mich. 455. (10) A contract that has conditions and restrictions printed in small, illegible type on the unsigned back thereof, some of which the plaintiff knew were impossible of performance by defendant from the very nature of defendant's business, should not be enforced as against the condition written into the contract on the face at the time of signing, to-wit, the furnishing of Two Star Semolina. (11) Where goods are bought for a particular purpose the ordinary rule of damages does not apply, but special damages arising out of the failure to deliver the article contracted for will and should be allowed if such purpose was known to the seller. Therefore it follows that the court erred in the giving of Instruction 5, requiring the jury to return a verdict for plaintiff on

defendant's counterclaim and in excluding evidence offered by defendant on same. Chalice v. Witte, 81 Mo. App. 84; Shouse v. Neiswaanger, 18 Mo. App. 236. (12) Instruction 2, given on behalf of plaintiff, was erroneous in that it permitted the jury to return a verdict in favor of the plaintiff even though the goods shipped were not of the quality called for by the contract. Authorities under points 6, 8 and 9. (13) If the contract was modified by the substitution of Three Star Semolina flour in the third shipment, the plaintiff must have its cause of action on the contract as modified and not on the original contract. (14) The terms of the contract as printed on the back are so unreasonable the court should refuse to enforce them.

*D'Arcy & Neun* for respondent; *H. L. Hoidale* of counsel.

(1) The contract was not void for want of mutuality. Neola Elevator Co. v. Krackman, 185 Iowa, 1254; Boyer v. Neel, 50 Mo. App. 26. (2) Contract provision for measurement of plaintiff's damages valid. New Prague Flouring Mill Co. v. Hewett, 226 Mich. 35; Sheffield-King Milling Co. v. Baking Co., 95 Ohio St. 180; Sheffield-King Milling Co. v. Jacobs, 170 Wis. 389, 175 N. W. 796; May v. Crawford, 150 Mo. 504; Goldman v. Goldman, 51 La. Ann. 761; Selby v. Matson, 114 N. W. 609; Ahlers v. Harrison, 108 N. W. 331; Clabeck v. Ford, 103 N. W. 516; Powell v. Burroughs, 54 Pa. St. 329; Nelson v. Read, 12 Fed. 441; Jacquith v. Hudson, 5 Mich. 123; Doan v. Rogan, 79 Oh. St. 372; Knox Co. v. Stone Co., 64 Oh. St. 361; Dwinel v. Brown, 54 Me. 463; Keeble v. Keeble, 85 Ala. 552; Erie Baking Co. v. Hubbard Milling Co., 217 Fed. 759; Kingman v. Western Mfg. Co., 94 Fed. 486; Russell Miller Milling Co. v. Bastasch, 142 Pac. 355; River Spinning Co. v. Atlantic Mills, 1⁵5 Fed. 466; United States v. Beham, 110 U. S. 338; Hinckley v. Pittsburgh Steel Co., 121 U. S. 264; Southern Cotton Oil Co. v. Heflin, 99 Fed. 339. (3) Defendant is barred from claiming any damages or complaining in any way on account of the alleged defective quality of the three shipments of Semolina delivered under the contract because of defendant's failure to comply with contract conditions as to notice to plaintiff, furnishing sample of alleged defective goods and filing itemized statement of claim. Freeman v. Aylor, 62 Mo. App. 613; Deere, Mansur & Co. v. Hucht & Fierling, 27 Mo. App. 1; Bank of Fitchburg v. West Lake, 21 Mo. App. 565; Nichols & Shepherd Co. v. Larkin, 79 Mo. 271; Boyer v. Neel, 50 Mo. App. 26; Kingsland & Douglas Mfg. Co. v. Board Bros., 60 Mo. App. 662; Kingman & Co. v. Schulenberger, 64 Mo. App. 548; Gaar Scott & Co. v. Nelson, 166 Mo. App. 51; Nichols Shepherd Co. v. Rhoadman, 112 Mo. App. 299; Pratt & Co. v. Langston Merc. Co., 111 Mo. App. 96; Weise v. Birdsall Co., 35 Mo. App. 229. (4) Aside from contract provisions last above

referred to, no damages are recoverable by defendant, because under the contract there was no warranty made in connection with the goods sold. Damages could be recovered, if at all, only by alleging and proving fraud, bad faith or gross negligence on the part of plaintiff in preparing the goods. No warranty can be implied where there is an express stipulation that no warranties are made. Lee v. Sickles Saddlery Co., 30 Mo. App. 201; Grojean v. Darby, 135 Mo. App. 586; Lindsay v. Davis, 30 Mo. 406; Hanson v. Hartee, 70 Minn. 282; Leonard Seed Co. v. Crary Canning Co., 147 Misc. 166, Ann. Cas. 1912 D 1077 and note, 37 L. R. A. (N. S.) 79 and note. (5) The contract contained these provisions: ''Contract shall be severable as to each installment shipped  .  .  .   nor shall seller's breach or default ·as to any installment give buyer right to refuse any other installment. . . . Acceptance of goods shall estop buyer from claiming damages, misrepresentation, fraud, breach of warranty or guaranty, defect in quality or other breach or default, as to such goods.'' These provisions were valid and binding and by reason of them breach, if any, by plaintiff in shipping inferior goods did not excuse defendant from his obligation to give shipping directions for the remainder of the goods. The parties by this provision settled a point over which there has been much controversy in the courts and on which the courts are not agreed. On a point on which the courts are divided, certainly the parties should be allowed to stipulate. Boyer v. Neel, 50 Mo. App. 26, 36; Habicht Braun & Co. v. E. B. Gallagher & Co., 137 N. W. 685; Ellison v. Grocery Co., 71 S. E. 391; Hop Co. v. Livesley, 114 Pac. 944; Gill v. Lumber Co., 151 Pa. St. 534; Cahen v. Platt, 69 N. Y. 348, 25 Am. Rep. 203; Roach v. Lane, 116 N. E. 470. (6) Plaintiff was engaged solely in interstate commerce so far as the State of Missouri is concerned. Therefore, the fact that it had not been licensed to transact business in Missouri is no defense. Corn Products Co. v. Candy Co., 156 Mo. App. 110; Wulfling v. Armstrong Cork Co., 250 Mo. 723; Hogan v. St. Louis, 176 Mo. 149; Amalgamated Zinc Co. v. Bay State Zinc Co., 221 Mo. 7. (7) An amendment setting up that defendant was induced to sign the contract by false and fraudulent representations involves a substantial change in the defense and should not be allowed. Singer Mfg. Co. v. Givens, 35 Mo. App. 602. (8) An amendment will not be allowed where the proof required to sustain it would be essentially different from the proof required to sustain the original petition. Laughlin v. Leigh, 226 Mo. 620; Sims v. Field, 24 Mo. App. 557; Scovill v. Glassner, 79 Mo. 449; Phillips v. Broughton, 30 Mo. App. 148. (9) Amendments are discretionary with the trial court. Sec. 1274, R. S. 1919; Long v. Overton, 7 Mo. 567. (10) And the discretion of the trial court in allowing or refusing amendments will not be interfered with by the appellate courts unless it is manifest

that the discretion has been arbitrarily and unjustly exercised. Little River Drainage Dist. v. Railroad, 236 Mo. 113; Ensworth v. Barton, 67 Mo. 622; Cullum v. Cundiff, 20 Mo. 522. (11) Amendments should be allowed only on terms which are not prejudicial to the other party. Stimson v. Cathedral M. Co., 264 Mo. 206; Tower v. Pauly, 67 Mo. App. 632. (12) It is the duty of the court in allowing an amendment "to place the party not in fault as nearly as possible in the same condition he would be in if no mistake had been made." Sec. 1291, R. S. 1919. (13) The contract was binding on the parties. Taylor v. Fox, 16 Mo. App. 527; Dowagiac Mfg. Co. v. Schroeder, 108 Wis. 109.

SEDDON, C.—Action to recover liquidated or stipulated damages for breach of contract. Plaintiff is a Minnesota corporation, having its office and mill at Minneapolis, Minnesota, and engaged in the business of manufacturing, or milling, from Amber Durum wheat, a flour product, commonly known by the trade name of "Semolina." Defendant is a Missouri corporation engaged in the business of manufacturing macaroni, spaghetti and similar products, and, in the manufacture of such products, uses Semolina flour. One Charles W. Batty, on and prior to October 5, 1920, was engaged in business on his own account as a flour broker in St. Louis, maintaining an office at his own expense. He represented, or sold the products of, several flour manufacturers, but sold no other Semolina flour than that milled by plaintiff. He received a commission from plaintiff of 15 cents per barrel on all Semolina flour sold on plaintiff's account, such commissions being paid to him at the end of each month. He received no other compensation from plaintiff for his services. Plaintiff had no office or place of business in Missouri.

On October 5, 1920, Batty, as a flour broker, sold to defendant by written contract for plaintiff's account 3,000 barrels of Two Star Semolina flour at an agreed price of $9.75 per barrel, shipments or delivery thereof to be made during the months of October, November and December, 1920. The contract was signed on behalf of plaintiff by Charles W. Batty, and on behalf of defendant by John L. Randazzo, and was executed in triplicate, one copy being left with defendant, one copy sent to plaintiff, and one copy retained by Batty. The contract was printed on a single sheet of paper, consisting of two pages. Paragraphs numbered 1 to 9, inclusive, of said contract are printed in small type, single-spaced. The first page, or face, of said contract, which bears the signatures of the parties, is as follows:

"Contract No...... Dated Oct. 5th, 1920.
"Yerxa, Andrews & Thurston, Incorporated, of Minneapolis, Minnesota, hereby agrees to sell to Randazzo Macaroni Mfg. Co., of Sixth and Carr streets, St. Louis, Mo., who agrees to buy from seller, at Minneapolis, Minnesota, at the price, or prices, in the quantity, or quanti-

ties, stated below, and on the terms and conditions and subject to the agreements appearing below and ON THE BACK HEREOF, the following described goods:

| Number bbls. flour or Semolina. | Commodity | Packages | Seller's brand, or other description. | Price flour Semolina per bbl. |
|---|---|---|---|---|
| 3000 bbls. | Flour "Buyer's Sacks" | Bulk | Two Star Semolina | $9.75 |

"Ship to St. Louis, Mo.

"Railroad delivery desired by buyer at destination as before on directions to be furnished by buyer, shipment is to be made by seller as follows: October, November and December shipment.

"Terms: Net. Arrival draft with bill of lading attached. Arrival draft.

"Draft through Boatmen's Bank of St. Louis.

"Freight allowed by seller to St. Louis, Mo.

"Par. 1. Buyer shall notify seller of date, or dates, for shipment which shall not be later than 'shipping date above,' or (if said date is extended) last day of extended period; also quantity and (if above style of package, if any specified, is not desired) package, or assortment of packages, wanted, and he shall take out (without previous request) all of above goods as aforesaid. 'Shipping date above' shall mean date, written above, on which, or before which, or on or before which, or last day of period, or of time, so written, within which it is specified above that shipment is to be made, space following the above printed words: 'On directions to be furnished by buyer, shipment is to be made by seller as follows:' being intended for writing in the shipping date, or dates, or time limit, or limits. Buyer's obligation to direct shipment, as in this paragraph, is of the essence hereof. Seller is not required to ship until it has received shipping directions as described in this paragraph, unless it elects to ship under clause (b) of paragraph 2. Shipping directions shall not bind seller unless received at its Minneapolis office, in writing subscribed by buyer, before five. o'clock P. M. Central time on 'shipping date above' or last day of extended period, if any, unless seller sees fit to act on same. If 'shipping date above' or last day of any extended period falls on a Sunday or a Minnesota legal holiday first day following, other than Sunday or such holiday, shall be taken or included.

"Par. 2. Buyer's failure or refusal to furnish shipping directions as in paragraph 1 shall give seller right, as to any of above goods remaining unshipped by reason thereof, to either (a) extend 'shipping date above' or extended period, if any, thirty days and thereafter (as long as buyer's said failure or refusal continues) continue the life hereof by as many such successive extensions as seller may desire; or, (b) ship such goods within thirty days after 'shipping date above,' or expiration of any extended period, exercising its judgment as to packages desired by buyer; also as to other particulars, if any required to be supplied in making shipment; or (c) treat contract as broken by buyer and cancel contract (as to such unshipped goods only) at five o'clock P. M. Central time on 'shipping date above,' or on last day of any extended period, and recover from buyer, on such unshipped goods, damages as set out in paragraph 5, construing date of such cancellation to be date of breach. If seller desires to exercise either of the rights at (b) or (c), last above, it shall at least five days before 'shipping date above,' or last day of (any) extended period, give buyer written notice of its intention to so elect, specifying approximate date, or dates, of shipment in case of election to ship. Such notice may be mailed to buyer to above or known address, and, if so mailed, shall be deemed to have been given at time of mailing thereof, time to be calculated from date of mailing, which shall count as first day. If notice is not so given,

seller shall be deemed to have elected under clause (a) of this paragraph and this contract shall automatically extend itself, as to any such goods so remaining unshipped, for thirty days at a time, (subject to hereinafter mentioned carrying charges against buyer) until buyer furnishes directions for shipment of such goods, or one of the rights (b) or (c), last above, is exercised. If seller under clause (c) of this paragraph, through mistake, cancels on a date, other than one authorized by said clause (c), but approximate to such authorized date, seller shall, nevertheless, recover, on such cancellation, damages, as in said clause (c), calculated on such authorized date approximate to such incorrect actual date of cancellation, even though notice of intended cancellation specifies an unauthorized date for cancellation, provided such notice is given, as aforesaid, at least five days before such authorized date. 'Approximate to,' as used last above, shall mean within five days of.

"Par. 3.   As to any of above goods shipped which buyer wrongfully fails or refuses either to accept or pay for, seller may resell same, at public or private sale, without notice, any time within 120 days after such failure or refusal, and recover from buyer, as liquidated damages thereon, difference between above purchase price thereof and price obtained on resale, if latter be less than former, plus interest on such purchase price at six per cent per annum from due date thereof; also all incidental loss and expense, including salesman's time and expense, and demurrage, storage, cartage, reconsigning and additional freight charges, etc., and any carrying charges unpaid on such goods. Resale anywhere in the usual course of seller's business, and resale at any terminal market or at or near destination, shall always be proper and price received conclusive unless bad faith is clearly proven.

"Par. 4.  Subject to qualifications herein, as to any goods which seller fails to ship within contract time, buyer is authorized to purchase, within 30 days after such failure, in the open market, at manufacturer's prices, in quantity equal to that which seller so fails to ship, goods of the same quality as herein contracted for, and recover from seller excess of price so paid, if any, over purchase price herein, which shall be his sole remedy for such breach or default, except that if seller makes late shipment buyer may refuse to receive same.

"YERXA, ANDREWS & THURSTON, Incorporated, Seller.
"By CHARLES BATTY, Salesman.
"JOHN RANDAZZO, Buyer.
"By RANDAZZO MACARONI MFG. CO."

(The words ''on the back hereof'' in the first clause of said contract are printed in bold-face capital type).

The second page of said contract is printed on the back, or reverse side, of the sheet of paper, and is as follows:

"Par. 5.   As to any wheat flour (if any is specified within); also as to any Semolina (if any is specified within) remaining unshipped by reason of buyer's breach or default, seller shall recover from buyer liquidated damages as follows: (a) a sum equal to 4c. multiplied by the number of bu. of wheat required to make such unshipped flour or (and) Semolina, figuring 4¾ bu. to the barrel of flour or (and) Semolina; plus (b) a sum equal to 3c multiplied by the said number of bu., which sum shall be calculated for each 30 days, or fraction thereof, intervening between date hereof and date of breach; plus (c) amount of decline, if any, per bu., (multiplied by said number of bu.) from date hereof to date of breach, in highest closing price, at Minneapolis, of such wheat, such price to be, as to Durum wheat flour (if any), also as to Durum (wheat) Semolina (if any), of Number 1 Amber Durum

wheat; and, as to wheat flour (if any) other than Durum wheat flour, also as to Semolina (if any) made from wheat other than Durum wheat, of number 1 Northern Spring wheat. In case of a rise in such price of such wheat between said dates, instead of a decline, seller shall recover the sums at (a) and (b) above, less a sum determined by multiplying amount of such rise, per bu., by said number of bu., such prices on date hereof and date of breach being taken to ascertain amount of decline or rise per bushel. Any carrying charge paid by buyer to seller on such flour or (and) Semolina only shall also be deducted from seller's said recovery. If there is neither rise nor decline in such price, seller shall recover the sums at (a) and (b) above, less such carrying charges paid, if.any. If date hereof falls on a Sunday or Minnesota legal holiday first day following, other than a Sunday or such holiday, shall be treated as date hereof for sole purpose of determining decline or rise in wheat prices under this paragraph. Such wheat prices as shown by 'Daily Market Record' of Minneapolis, or records of Minneapolis Chamber of Commerce, shall be conclusive unless proven materially erroneous. Wheat prices above refer to wheat (of grade mentioned) known at Chamber of Commerce, Minneapolis, as 'cash' wheat 'delivered.' 'Number 1 Northern Spring' and 'Number 1 Amber Durum' refer, respectively, to a certain grade of spring wheat and a certain grade of durum wheat, adopted or fixed, from time to time, in Minnesota. As to other mill products (if any are specified within), so remaining unshipped under this contract, if any, seller shall recover carrying charges unpaid thereon, if any, and difference between within purchase price thereof (after first deducting from such purchase price amount of freight allowance, if any, on such other mill products) and value thereof to seller, in carload lots, at said Minneapolis, based on seller's minimum selling price on date of breach, if such value be less than such purchase price; but if such value is greater than such purchase price (after first deducting from such purchase price freight allowance, if any, as aforesaid) the difference shall be credited to buyer, not to allow buyer recovery but solely in reduction of damages, if any, recoverable by seller, under this paragraph, on such wheat flour or (and) Semolina, if any. 'Other mill products,' above, mean flour mill products other than wheat flour and Semolina, and the expression shall apply to any one of such products as well as to more than one. So-called Red Dog, or low-grade, flour shall be regarded as feed. Semolina contracted for, if any, shall be taken to be Durum wheat Semolina unless otherwise specified in writing on face hereof.

"Par. 6. Buyer shall pay seller for any and all extensions of time under this contract (whether of 'shipping date above' or of extended period and whether at buyer's request, or otherwise) carrying charges equal to 15c per barrel on wheat flour, if any, 15 cents per bbl. on Semolina, if any, 50c per ton on feeding stuffs for animals, if any, and 5c per hundred pounds on all other products, if any, for each 30 days, or fraction thereof, extended, due on demand. Any such charges accrued on date of any shipment may be included in draft therefor. Granting of extension shall always be optional with seller. No extension (except such as may occur pursuant to clause (a) of Par. 2) shall bind seller, unless agreed to in writing subscribed by it at its said office, unless it sees fit to act on same.

"Par. 7. Shipment will be made in within package (if any specified) unless buyer under Par. 1 indicates contrary desire or unless seller ships under clause (b) of Par. 2 and thinks buyer desires goods packed otherwise. Buyer cannot change within specified package, if any, except as to wheat flour unless seller consents to such change in writing through its said office. If shipment of wheat flour is made in other than within specified style of package, if any, Millers' National Federation package differentials, in effect at time of shipment, shall govern. If sale is specified within to be in bulk or bulk basis or if no

style of package is specified within, buyer shall, in ample time for shipment, deliver his own sacks at seller's mill, at said Mpls., or notify seller in writing, at its said office, as to package desired, and, failing to do either, seller may either ship in its own sacks, using its judgment as to package, or assortment of packages desired, or it may ship in bulk; and cost to seller of packages, if shipment is made in seller's sacks (whether at buyer's request or on seller's election), shall be charged to buyer and added to draft. Shipment by seller within 20 days after receipt of buyer's shipping directions, or within 20 days after any date fixed or specified for shipment (whether specified by buyer under Par. 1, or otherwise fixed) shall not be late; nor shall shipment within five days before any such date be premature, except that under clause (b) of Par. 2 shipment cannot be made until after 'shipping date above,' or last day of extended period, if any. In event there is more than one installment of goods shipped or stipulated herein to be shipped, contract shall be severable as to each installment shipped or stipulated herein to be shipped, except as to seller's right under clause (1) in Par. 8; and extension of time as to one or more installments shall not affect any other; nor shall seller's breach or default as to any installment give buyer right to refuse any other installment. Where goods are taken or paid for by buyer, no breach or default of seller respecting same shall authorize buyer to return goods, his sole remedy being by claim for damages. Buyer shall have neither right of inspection nor right of test, before paying for goods. Acceptance of goods shall estop buyer from claiming damages, misrepresentation, fraud, breach of warranty or guaranty, defect in quality or other breach or default, as to such goods. The whole of any shipment shall be deemed to have been accepted by buyer in any one of the following cases: (a) if buyer fails to report defect, breach or default respecting same to seller's said office by registered mail, in writing over his signature, immediately on discovery by him of such defect, breach or default, and, in any event, before expiration of 10 days after receipt by him of shipment; or, (b) if buyer fails (where buyer claims inferiority or defect in goods shipped) to send to seller's said office by express, within such 10 days, a 5-pound sample of goods claimed to be defective or inferior; or, (c) if, (in any case) buyer fails to transmit to seller's said office by registered mail signed, verified and itemized statement of claim for damages before expiration of 30 days from receipt by him of shipment on which claim is made; but this shall not preclude seller from setting up any other conduct of buyer, or facts, which, in law, would constitute an acceptance. Shipment made on arrival draft terms shall be deemed to have been received by buyer on date of payment of draft and on any other terms on date of arrival at destination to which shipped by seller. Buyer bears all transportation risks. On shipments to be paid for through draft, with bill of lading attached, seller retains title to goods to secure buyer's performance. If goods shipped on draft terms are destroyed in transit, purchase price thereof shall become immediately due and payable. Seller has first lien for unpaid purchase price, if any, of goods involved, and accrued carrying charges thereon, if any, on all buyer's claims against carrier. Failure of bank named within, if any, or any of its agents, to pay amount of draft to owner thereof, shall make buyer liable in such amount, such bank being buyer's agent. In milling within goods seller shall not be confined to any particular kind or quality of grain, unless so expressly stipulated on face hereof in writing. Net weight of goods when shipped governs. Shipment will not be made in less than minimum carloads, unless entire quantity sold is less. Although it is seller's intention to make shipment from said Mpls., the point from which shipment of within goods is made shall not be material and manufacture thereof at any mill is permitted. Arrival draft terms require payment (on arrival of shipment at destination) at bank named

within, or, if none is named, at any bank chosen by seller, of draft for proper charges. If any point is named within to which freight is to be allowed by seller, seller shall either prepay freight to such point or deduct same from invoice or draft or shall prepay part and deduct remainder, but if freight rate from said Mpls. to such specified point, in effect at time of shipment, is different from such freight rate in effect on date hereof, increase in such rate shall be added to and decrease taken from amount of purchase price within stated to protect seller against increase, if any, in freight rate, and give buyer benefit of decrease, if any. Except as to delivering carrier, if any is specified within, seller shall have unqualified option as to routing.

"Par. 8.   If buyer either (a) clearly informs seller that he will not perform contract, or, (b) directs or requests seller to cancel contract, or, (c) admits or asserts his inability to perform contract, or, (d) wrongfully fails or refuses to pay any carrying charges due or pay for goods shipped, seller may, as to goods shipped which buyer wrongfully fails or refuses to pay for or accept, if any, recover damages as in Par. 3, and, as to such of within goods as remain unshipped, if any, seller may, without prior notice, either: (1) treat entire contract as if broken by buyer and cancel entire contract and recover damages calculated as in Par. 5, date of such cancellation being construed date of breach, damages to be calculated, in such instance, on any and all of within goods remaining unshipped and not merely such as remain unshipped by reason of buyer's failure or refusal to furnish shipping directions therefor, and, in event of such cancellation, carrying charges to be deducted shall be all carrying charges paid, if any, by buyer to seller, or any and all wheat flour or (and) Semolina remaining unshipped; or, (2) entirely disregard such conduct of buyer. After conduct described at (a) or (b) of this Par. seller shall not elect more than once under clause (a) of Par. 2, if said conduct is communicated by writing signed by buyer, unless buyer makes withdrawal of such conduct. If seller elects under clause (1) of this Par., it shall, not later than 48 hours after making such election, mail buyer notice (to within or known address) of having made such election, and, failing so to do, shall be deemed to have elected under clause (2) of this Par. Seller may elect under clause (1) of this Par. any time within 20 days after becoming aware of grounds for election.   In event of conduct of buyer as in either (a) or (b) of this Par. communicated by writing signed by buyer and in event seller elects thereafter under clause (a) of Par. 2, but fails to elect under clause (1) of this Par. and buyer fails to communicate written withdrawal of his said conduct, or to direct shipment, contract shall terminate of itself, without notice, on last day of last authorized extended period, and seller shall recover damages, as of date of such termination, as if cancellation had been made under clause (1) of this Par.

"Par. 9.   Only authority of seller's salesman is to sign (execute) this contract for seller. After salesman has executed contract all matters must be taken up in writing, directly with seller's said office only. This contract is binding on both seller and buyer from the time signed (executed) by buyer and seller's salesman, unless it is written, on face hereof, that contract is subject to seller's confirmation, in which event contract shall not bind seller until it has mailed, or placed in course of transmission by telegram, directly to buyer, to within or known address, its acceptance or confirmation hereof from its said Mpls. office. Such confirmation, or acceptance, shall always be timely if so made not later than 20 days from date hereof and shall make contract mutually binding unless offer (which this contract, before its acceptance by seller, constitutes when it has written on its face that it is subject to seller's confirmation) is revoked by buyer before such acceptance, and revocation of offer, to be effectual, must be in writing, subscribed by buyer, and received by seller at its said Mpls. office, before seller's accep-

tance as aforesaid; and, if confirmation is made after the time last above limited, it shall be considered timely unless buyer returns same to seller's said office, by registered mail, immediately on his receipt thereof. Time shall be of the essence of this contract, which contains the whole agreement. This is a contract to sell, by description, goods to be manufactured, unless specifically written on face hereof that sale is by sample. Buyer shall not claim any modification, rescission or annullment hereof, or of any part hereof, or release from any of the provisions hereof by mutual agreement, unless such agreement is in writing subscribed by seller. Seller shall not waive any provision herein unless waiver is expressly agreed to in writing subscribed by it at its said office. There are no representations, guaranties or warranties except such as may be written on face hereof, if any. No collateral agreement shall bind seller unless confirmed in writing by it, directly to buyer, from seller's said office. No provision shall be construed as a penalty as that is not intended. In fixing damages as in Par. 5, clause (c) of Par. 2 and clause (1) of Par. 8, desire is to agree upon a certain mode of calculation since seller's actual loss cannot be predetermined, would be hard to ascertain and a matter of argument and unprofitable litigation, said mode being an equitable, reasonable and fair general rule for measurement of seller's prospective actual loss. Seller is not required to prove any actual loss to recover damages last above referred to. Buyer shall not, in any instance, of seller's breach, recover damages by way of lost profits or injury to his business, or loss of trade, time, labor, ingredients, products, baked goods or materials, but shall recover general damages only. Buyer shall not recover damages of any nature from seller unless he transmits to seller, at its said office, by registered mail, itemized statement of claim which must be signed and verified, under oath, by buyer, and no suit shall be brought on any such claim by buyer until 30 days after seller's receipt of such statement. Nothing shall authorize recovery from seller by buyer, of any sum, under either Par. 3, Par. 5, clause (c) of Par. 2 or clause (1) of Par. 8, the intent being that buyer must realize the benefit hereof by taking delivery of the goods and making payment therefor and that he shall not profit by his breach hereof. If seller makes cancellation under either clause (c) of Par. 2 or clause (1) of Par. 8 and calculation under Par. 5 shows no damage recoverable by seller, contract shall stand canceled without damages to either party as to goods with respect to which cancellation is made. Delay in seller's performance due to strikes, fires, accidents, inability to obtain cars, carrier's embargoes, or any cause beyond its control, shall not authorize buyer to rescind contract or treat it as broken but shipment shall be made within a reasonable time after disappearance of cause for delay, carrying charges aforesaid not to apply to period of such delay. Under clause (a) of Par. 2 each extension period shall comprise, in itself, 30 days. If seller, in any instance, denies receipt of communication from buyer, it shall be deemed that none was received unless buyer produces seller's written acknowledgment thereof or receipt showing delivery thereof to seller by registered mail. If seller, in any instance, denies sending of any communication to buyer, it shall be deemed that none was sent unless buyer produces same. The truth of the recitals herein shall not be denied. 'Contract' means this identical instrument, date of which shall be date of contract. 'Herein' means, in this contract. 'Hereof' means, of this contract. 'Unshipped' means not shipped. Abbreviations used are: Bbl. for barrel; bu. for bushel, or bushels; Par. for paragraph; c for cent, or cents; and Mpls. for Minneapolis, Minnesota."

The pleadings are voluminous and lengthy, but it is necessary that we state the substance thereof. The petition alleges, in substance,

that plaintiff is a corporation doing business under the laws of the State of Minnesota; that it was engaged in manufacturing out of Durum wheat a product known to the trade as Semolina flour; that on the 5th day of October, 1920, the defendant entered into a contract in writing subscribed by Charles W. Batty on behalf of plaintiff, and by Joseph N. Randazzo on behalf of defendant, whereby the plaintiff agreed to sell, and the defendant to buy, a quantity of plaintiff's Two Star Semolina flour, equivalent to 3,000 barrels, at $9.75 per barrel; that upon shipping directions furnished plaintiff by defendant, it shipped on November 20, 1920, 335 barrels of Semolina, and on December 29, 1920, 335 barrels; that defendant failed and neglected to furnish shipping directions for the remaining 2,330 barrels within the time limited on the face of the contract to so order on or before five o'clock, December 31, 1920; that plaintiff thereupon, under clause (a), paragraph 2 of said contract, extended the life of same for a period of thirty days, to and including January 31, 1921; that the extension was made with the consent and at the request of defendant; that on January 20, 1921, plaintiff, on shipping directions from defendant, shipped 300 barrels of Semolina; that on April 1, 1921, at five o'clock P. M. Central time, the defendant breached its contract by reason of its failure to take or order out the remaining 2,030 barrels of Semolina, to the damage of plaintiff; that said shipping dates were extended by plaintiff with consent of defendant from February 1st to March 2nd, and from then to and including April 1, 1921; that plaintiff elected to cancel said contract under clause (c) of paragraph 2 and charged defendant with damages, as provided in said contract; that plaintiff duly notified defendant of its intention to cancel said contract in accordance with the provisions thereof; that the highest closing price of Minneapolis, Minn. No. 1 Amber Durum cash wheat per bushel on October 5, 1920, was $1.94½, and on April 1, 1921, was $1.48, making a decline in wheat prices of 46½ cents per bushel; that plaintiff is entitled to damages, as authorized by clause (c) of paragraph 2, calculated pursuant to paragraph 5 of said contract, as follows:

(a) 4c x 9642½ ................................$ 385.70
(b) 3c x 9642½ x 6 ............................. 1,735.65
(c) Decline in wheat price per bushel as aforesaid,
  46½ x 9642½ ............................... 4,483.76

   Total sum due to plaintiff from defendant under the
    terms of said contract, covering the breach by defendant of the said contract as to the said 2,030
    barrels of Semolina ...........................$6,605.11

Plaintiff alleged that it was able, ready and willing to perform and to manufacture and to ship said Semolina, but that defendant

neglected and failed and refused to give shipping instructions; and that on April 4, 1921, it demanded the above amount, and payment was refused, praying judgment and interest.

The answer is: first, a general denial, coupled with an admission that defendant is a corporation; second, that the plaintiff was doing business as a foreign corporation in this State without a license so to do; third, defendant admits that it entered into said contract with plaintiff on October 5, 1920, but avers and alleges that the flour shipped was not Two Star Semolina flour; fourth, defendant denies that the plaintiff bought wheat for the manufacture of the 2,030 barrels of flour, or that it had such wheat on hand for this particular contract; that the plaintiff's mills were shut down and that plaintiff could not have delivered the flour; fifth (a), that the contract is unilateral and unenforceable; (b) that the contract is so intrinsic in its terms and conditions and is printed in such small type, closely spaced, that it cannot be understood by the ordinary mind and was not understood by the defendant; (c) that paragraphs 5, 6, 7, 8 and 9, appearing on the back of said contract, are void and were obtained through fraud and misrepresentation of plaintiff's agent, in stating that they were mere rules of the company and not a part of the contract; (d) that plaintiff, not having bought any wheat, has suffered no loss and cannot recover; (e) that the contract is a gambling contract; (f) that the plaintiff did not have the goods mentioned in the contract and did not sell any goods and never sustained any actual loss; (g) that the flour shipped was of an inferior grade, quality and character than Two Star Semolina flour, and that defendant rescinded said contract and refused to furnish shipping instructions; (h) that plaintiff's extenions of said contract were inequitable and unjust, and plaintiff extended said contract at a time when wheat had dropped in market price, and canceled said contract for the purpose of claiming damages thereunder; (i) that the clauses for liquidated damages are penalties, because plaintiff's damages, if any, could be computed with certainty; (j) the contract is void for lack of mutuality; (k) that plaintiff shipped Three Star Semolina without any written order and violated its contract and cannot recover.  Said answer is coupled with a counterclaim for $8,166.91, alleged to be defendant's loss or damage suffered by reason of the shipment of an inferior grade of flour wholly unfit for defendant's uses.

Plaintiff's reply and answer to defendant's counterclaim denies generally each and every allegation thereof; pleads certain specific provisions or requirements of the contract repecting the giving (by defendant to plaintiff) of written notice, by registered mail within ten days after receipt of shipment, of any claimed inferiority or defect in the goods shipped; the sending to plaintiff, by express, within such ten days, of a five-pound sample of all goods claimed to be

defective or inferior; and the transmission, by registered mail, to plaintiff of a signed, verified and itemized statement of claim for damages before the expiration of thirty days from receipt by defendant of any shipment on which claim is made; that defendant had failed to comply with said pleaded provisions and requirements of the contract, and, therefore, defendant has accepted the flour contained in each of said shipments as a compliance with the contract and is precluded and estopped to set up any claim for damages against plaintiff for the alleged reason that the flour deliverd was not Two Star Semolina or that said flour was of an inferior grade, quality and character.

The evidence shows that three shipments of Semolina were made by plaintiff to defendant, as follows: 335 barrels of Two Star Semolina on November 20, 1920; 335 barrels of Two Star Semolina on December 29, 1920; and 200 barrels of Two Star Semolina and 100 barrels of Three Star Semolina (300 barrels in all) on January 20, 1921; and that the aggregate number of barrels of Semolina shipped was 970, thus leaving 2,030 barrels remaining unshipped on April 1, 1921, the date plaintiff elected to treat the contract as broken and canceled the remaining or unshipped portion of same. The sale price, or cost to defendant, of each of the three shipments was represented by sight draft drawn upon defendant with bill of lading attached. The draft representing the first shipment was paid by defendant on December 4, 1920, that representing the second shipment was paid on January 11, 1921, and that representing the third shipment was paid on February 1, 1921. Respecting the shipment of 100 barrels of Three Star Semolina on January 20, 1921, the witness Batty testified that he had a conversation with Mr. Joseph Randazzo, an officer of defendant, the latter part of December, 1920, or the first part of January, 1921, and that he (Joseph Randazzo) "told me that he would like to have a reduction on the contract, and I told him that if he wanted to we could ship him some Three Star instead of Two Star at a dollar a barrel less. That any provision of the contract that he wanted to consider I would take up with the company, and he said, 'Go ahead and ship 100 barrels and they would try it out.' Three Star at $1 less than contract. I notified Yerxa, Andrews & Thurston and they shipped accordingly." Joseph Randazzo denied that he had, at any time, given either written or oral instruction to plaintiff or to Batty to ship Three Star Semolina. However, an invoice of the shipment of January 20, 1921, was mailed to defendant at the time of said shipment, showing that said shipment included 100 barrels of Three Star Semolina at the price of $8.75 per barrel (one dollar per barrel less than the contract price of Two Star Semolina). The draft representing said shipment was paid by defendant on February 1, 1921, and no complaint is shown by the evidence to

have been made by defendant that the shipment included 100 barrels of Three Star instead of Two Star Semolina.

Some thirty or more letters and telegrams (all of which are in evidence) passed between the parties to the contract. It would unduly extend this opinion to set out this correspondence *in toto.* A brief summary of the correspondence, however, should be stated herein. On October 20, 1920, defendant wrote plaintiff not to ship any Semolina until plaintiff received shipping instructions, because defendant had other shipments of Semolina on the way. On October 25th, defendant advised plaintiff that defendant was not in position to give shipping instructions owing to an unprecedented depression in business, which precluded the handling of Semolina at that time, but that shipping instructions would go forward as soon as possible. On October 29th, defendant wrote plaintiff that it had canceled shipping instructions to another mill and that plaintiff might ship one carload of Semolina. On November 4th, defendant telegraphed plaintiff to suspend the shipment ordered on October 29th until further orders. In reply, plaintiff wrote defendant, on November 5th, acknowledging the cancellation of shipping instructions and advising defendant that plaintiff was badly in need of shipping instructions in order to complete or fill the contract before January 1, 1921. On November 8th, defendant wrote that as soon as possible it would start ordering Semolina at the rate of one carload per week, but that defendant should not be expected to use it any faster than possible considering the present stagnation of business. On November 11th, defendant directed plaintiff to ship one carload of Semolina on November 20th. Defendant wrote plaintiff on December 4th: "We take advantage also of this opportunity to call your attention to the present condition of the macaroni market. We find that the present market value of Semolina is so much lower than the price contracted for by us with you, that we will not be able to effect any sales because our competitors seem to all be able to undersell us. The macaroni market, in line with many other businesses, is very dull anyway, and under such conditions it is practically impossible to secure any orders in the face of acute competition. We would therefore ask you to kindly see if it would not be possible to give us a slight reduction on the price contracted for your product in order that we may resume operations in a way that we may be better able to meet our competitors." Plaintiff replied on December 6th: "There is no possible way that we or any other miller could make a reduction on a flour or Semolina contract already booked. We purchased the wheat just as soon as we confirmed the sale and we cannot get any reduction in the wheat price from the people of whom we purchased such wheat, and therefore we are in no position to give you a reduction any more than we could expect you to pay us the difference if the

market were higher than when you contracted with us for the Semolina, and you know many times in the past we have delivered Semolina at all the way from one dollar to three dollars a barrel under existing market price when shipments were made. Everybody is confronted with the same problem and we will all have to make the best of it and absorb the losses that confront each of us soon as possible.'' On December 20, defendant wrote plaintiff: ''This is to advise you that you may ship to us immediately a carload of Semolina. We must, however, call your attention to the fact that we find the stuff which you sent to us in the last carload is not Semolina No. 2 but appears to be what is known as medium Semolina and is entirely too dark for the manufacture of our high grade macaroni. We wish to inform you therefore that you must send to us Semolina No. 2 as specified in our contract or else we will be compelled to refuse the shipment.'' Plaintiff replied on December 22d, acknowledging receipt of shipping instructions for another carload and advising defendant that the first shipment was not medium Semolina, although there is sometimes a slight variation in granulation, and requested defendant to send plaintiff a pound sample of the contents of the first car. On December 24th, defendant replied, reiterating its complaint that the Semolina in the first shipment was too dark and too fine and stated that it would forward a sample of the Semolina in question as requested. Plaintiff replied on December 30th, that ''our Semolina is ground no finer than it has ever been, that we are turning out a very beautiful article, and although you may have found the color a little dark, it probably was due to the fact that we are at the beginning of the crop and when a change is made from old to new wheat the product always shows a little darker at that time. Furthermore, high gluten in the wheat always makes a little darker color than the light colored wheat, which contains less gluten, and you know as well as we do that gluten is one of the extremely important features.'' On February 5, 1921, defendant wrote plaintiff; ''We wish to inform you that having received from you the third carload of Semolina, we have worked for a whole day the Semolina No. 2 sent to us in this car, without mixing with it any of the No. 3 Semolina, and we find that the macaroni thus produced is too weak and too dark. What kind of a product would we then obtain were we to mix the Semolina No. 2 with the Semolina No. 3? You will readily understand that with the competition which we must meet nowadays it is impossible for us to use any such stuff. If besides paying a big price for our Semolina we are not to receive the right stuff, our losses will be too great and we cannot continue the manufacturing. We cannot obtain over $1.70 or $1.75 a box for our product when it is first class, and for this reason we are asking you to see what you can do for us. We have been compelled to secure other Semo-

lina from other concerns in order to mix it with your product, which we found we could not use alone, owing to its bad quality. We are anxiously awaiting your reply in order to learn just what you are going to do for us, and sincerely hope you are going to help us out as we could not afford to have additional losses." On February 11th, plaintiff replied, stating that it had received a sample of spaghetti made out of the Semolina in the third shipment and that it seemed to be a good product; that plaintiff had also received a sample of the Semolina from that shipment and that a test of the sample showed it to be of good quality. Defendant responded on February 14th, by stating that, while it did not dispute the condition in which the sample of macaroni had reached plaintiff, nor plaintiff's test of the Semolina, the fact remained that the results were as outlined in defendant's letter of February 5th, otherwise that letter would not have been written. The letter closed with the hope that plaintiff "will see the way clear to do something for us in this instance with a view to helping us out of this difficulty." Plaintiff replied, on February 16th, by saying that the laboratory tests showed the sample of Semolina to be "fully standard for a No. 2 Semolina, and for this reason we reported back to you on same as per our letter of February 11th. We note that you are still hoping that we will see our way clear to do something for you in this instance. Don't know just what your intention is in this connection, but certainly if you are expecting any relief as far as price is concerned on the balance of unshipped Semolina due you on your contract, which was indicated to us through correspondence recently received from Mr. Batty, of course we are strictly up against it, as it is impossible for us to make any reduction, as the wheat was bought at the time the sale was made and has been carried ever since, and you, of course, realize that the expense of carrying such contracts is heavy. We have been very patient regarding delivery of this balance, realizing conditions that you are confronted with, and we are very glad to so accommodate you, but we must now call your attention to the fact that this contract is getting pretty old and that we shall expect shipping directions ordering the balance forward within a very reasonable length of time, and shall hope to have your directions for several cars of same to move within the next thirty days, and it will be absolutely necessary that the entire balance be shipped during March, 1921." Plaintiff received no reply to the last letter and, on February 23d, plaintiff again wrote defendant that Mr. Batty had reported to plaintiff by letter, dated February 18th, that defendant claimed a loss of $500 on the third carload of Semolina and requested shipment of 300 barrels of Two Star Semolina on or about March 1st on condition that plaintiff allow defendant $500 off the invoice price of that shipment. Plaintiff stated that it stood ready to make

the shipment requested, but could not allow the claim of $500, saying that "we regret very much that it is impossible to meet your views in this connection, but your claim, in our opinion, is exorbitant, even if the test of the Semolina from the car showed inferior quality, which it did not, and we are therefore obliged to refuse your claim, as there is no alternative," and plaintiff again requested shipping directions to cover the balance of the contract so that shipments could be made on or before March· 31st.  Defendant acknowledged receipt of said letter on February 25th, advising that Mr. Randazzo was out of the city and it was not in position to give shipping directions on any specified date.  Hearing nothing further from defendant, plaintiff telegraph defendant on March 15th, again requesting shipping directions on the entire balance of 2,030 barrels so that shipments could be completed by March 31st, and confirmed the telegram by registered letter of the same date, advising defendant that there was a balance of 2,030 barrels unshipped on the contract because defendant had not given shipping directions, which shipments plaintiff stood ready to make up to and including five o'clock P. M., Central time, March 31, 1921, and giving notice to defendant, under clause (c), paragraph 2, of the contract, that, if defendant did not give shipping directions on the remaining 2,030 barrels of Semolina on or before five o'clock P. M., Central time, March 31, 1921, plaintiff would treat the contract as broken and cancel the balance, charging defendant with damages as calculated under the provisions of paragraph 5 of the contract.  Defendant receipted for this registered letter on March 17, 1921.  On March 16th, defendant acknowledged receipt of plaintiff's telegram of March 15th, stating that the Semolina shipped in the first and third cars was such as to occasion a loss to defendant and that the macaroni made therefrom was dark in color and would easily break up, whereby defendant had sustained a loss of $2988.99 on macaroni made from those two shipments.  Defendant further stated therein: "We cannot use any more Semolina of the kind and class shipped us in December and February, and if the quality you now have on hand is the same we cannot use it at any price.  However, if you will allow us the loss sustained and will allow inspection of the Semolina before accepting, you may ship at intervals to suit, otherwise we cannot use it."  Plaintiff did not reply to defendant's letter, but on April 1, 1921, plaintiff wrote defendant by registered letter advising that, by error in its letter of March 15th, it had specified March 31st as the date for cancellation, whereas the letter should have specified April 1st, and that since no shipping directions had been received up to five o'clock P. M., Central time, on April 1, 1921, for the remaining 2,030 barrels of Semolina, plaintiff had treated the contract as broken and had canceled the same, puruant to notice given in the letter of March 15th, under clause (c) of paragraph 2, and

charged the defendant with damages calculated in accordance with paragraph 5 of the contract, the damages being itemized in said letter in the sum of $6,605.11, payment of which sum was demanded from defendant. The registry return receipt shows that defendant received said letter on April 4, 1921, which is treated as the date of plaintiff's demand.

Plaintiff's officers testified, in substance, that plaintiff, on October 5, 1920, purchased, on option, approximately 14,000 bushels of wheat as a protection or "hedge" against the sale of 3,000 barrels of Semolina made to defendant on that day; that wheat was purchased at the rate of approximately four and three-fourths bushels to each of said 3,000 barrels of Semolina; that a total of 130,000 bushels of wheat was bought on option by plaintiff on October 5, 1920, to cover all sales of flour or Semolina made by plaintiff on that day, including the sale to defendant, the purchases of wheat being at the rate of four and three-fourths bushels of wheat to each barrel of flour of Semolina sold or contracted to be sold on that day; that plaintiff, immediately on making a sale, or contracting for a sale, of Semolina, would purchase an option for future delivery of wheat sufficient to cover the sale upon the basis mentioned; that such was its invariable practice and custom; that the sale price of flour or Semolina is based on the current price of wheat on the day of the sale of such flour or Semolina and an option for future delivery of wheat is bought at once (on the day of the contract for sale of flour or Semolina) in order to avoid a loss in the event of an increase or rise in the price of wheat; that four and three-fourths bushels of wheat are required to manufacture each barrel of Semolina flour; that subsequently the options so purchased for future delivery of wheat are sold and converted, from time to time, as shipping instructions are received by plaintiff upon contracts for the sale and delivery of Semolina, into cash wheat; that cash wheat is the term used in the milling trade and applied to wheat on the track ready for immediate delivery when purchased, and option wheat is the term commonly used in the milling and grain trade applying to a contract for the future delivery of wheat; that the practice or custom of purchasing wheat against a contract for future delivery of flour or Semolina is commonly referred to in the milling trade as "hedging"; that the wheat purchased by plaintiff on October 5, 1920, against the contract with defendant, was optional Durum wheat; that, when plaintiff purchased an option, it was committed or bound to buy the particular wheat described in the option; that plaintiff expected to, and does, take delivery of every bushel of optional wheat bought, unless sold out against a cancellation upon a flour contract; that, on the option purchased on October 5, 1920, plaintiff could not get No. 1 or No. 2 Durum wheat; that the option was part of the general purchase of

wheat against the general sales of flour of that day, among which was the Randazzo sale; that the optional wheat purchased by plaintiff on October 5, 1920, was thereafter converted into cash wheat and "there is no way of telling just who got the products made from that particular wheat," but it was used by plaintiff in manufacturing flour or Semolina which went to various customers; that the cash wheat, into which the optional wheat was converted, was ground in plaintiff's mill; that plaintiff "couldn't tag any particular option and follow it through, but had that quantity of wheat at all times, either in the form of cash wheat or in the form of contract for future delivery;" that, in the event of a decline in the price of any particular grade or kind of wheat, there is a relative, or proportionate, decline in the price of all other grades or kinds of wheat; that it was the aim or purpose of plaintiff to keep completely "hedged" at all times against all unfilled sales of flour or Semolina to customers, so that it had on hand, at all times, a corresponding or equivalent amount, either of option or cash wheat, or both, against the unfilled portions of its outstanding flour contracts; that there is no day that plaintiff does not have four and three-fourths bushels of wheat, either cash or optional, against every barrel of Semolina it is obligated to deliver; that options are converted into cash wheat as the cash wheat is needed; that, where wheat is thus bought against Semolina sales, no attempt is made in the milling trade to preserve or follow the identity of the purchased wheat; that it is impossible to follow the identity of any particular wheat bought, because such wheat goes into one general mass of wheat; that from October 5, 1920, to January 1, 1921, plaintiff had always in its bins approximately 34,000 bushels of Amber Durum wheat for the purpose of filling any deliveries of Semolina flour it might have to make upon outstanding contracts, and during the period of January 1 to April 1, 1921, plaintiff had in its possession between 33,000 and 34,000 bushels of Amber Durum wheat; that plaintiff's mill was not in operation during the months of February, March and April, 1921, because of lack of shipping directions from its buyers due to dull business in the macaroni trade; that plaintiff never milled Semolina flour for storage, but such flour is only manufactured after shipping directions have been received; that plaintiff could have resumed milling operations at any time during the closed period upon receiving shipping directions from any of its customers; that the shut-down was temporary and plaintiff was ready to start its mill at any time during such period on receiving shipping directions from defendant, or any other customer; that, following the cancellation on April 1, 1921, of the unfilled balance of 2,030 barrels of Semolina upon defendant's contract, plaintiff sold an equivalent 10,000 bushels of May Durum wheat, held by it against said contract, on April 8, 1921, at $1.42½ cent per bushels. Plaintiff proved, by

the testimony of its officers and by copies of the "Daily Market Record" of Minneapolis (referred to in paragraph 5 of the contract) in evidence, that the highest closing price of No. 1 Amber Durum cash wheat delivered at Minneapolis on October 5, 1920, was $1.94½ per bushel and that the highest closing price of No. 1 Amber Durum cash wheat delivered at Minneapolis on April 1, 1921, was $1.48 per bushel, showing a decline in the price of such wheat of 46½ cents per bushel, the basis upon which liquidated damages were calculated under paragraph 5 of the contract.

Plaintiff, for the purpose of showing that paragraph 5 of the contract, providing for liquidated damages in case of breach of contract by defendant, is reasonable and that actual damages are difficult of ascertainment and admeasurement, offered the testimony of Mr. Yerxa, to the effect that there are five elements of damage accruing to plaintiff on account of a breach of the contract by defendant: (1) the difference or decline in the price of wheat between the date of contract and date of the breach; (2) the cost of carrying such wheat for such period of time; (3) the cost of purchasing such wheat and the cost of resale of the wheat; (4) the loss entailed by forced shutdown of its mill (or overhead) because of lack of shipping directions; and (5) the estimated profit in the milling or manufacture of the Semolina, had such Semolina been ground and delivered; that none of those elements of damage is susceptible of definite or accurate calculation, but each element is subject to variation; that plaintiff's approximate damage based on said five elements was about $7,910, subject to a variation of approximately $1,500 to $2,000, and that such variation in said five elements of damage is not susceptible of accurate or definite determination.

Defendant made certain offers of proof, which were excluded by the trial court and which will be referred to in the course of the opinion. At the close of all the evidence, the trial court peremptorily directed the jury to find for plaintiff on defendant's counterclaim. Nine jurors signed and returned a verdict in favor of plaintiff on its cause of action, assessing plaintiff's damages at the sum of $6,605.11, with interest from April 4, 1921, amounting to $429.32, or the aggregate sum of $7,034.43, and the jury returned, by their verdict, a finding in favor of plaintiff on defendant's counterclaim. After unsuccessfully seeking a new trial, defendant was granted an appeal to the St. Louis Court of Appeals. The latter court, on motion, transferred the cause to this court for the reason that defendant, by its counterclaim, seeks to obtain judgment against plaintiff for an alleged itemized loss of $8,166.91, which sum exceeds, in amount, the appellate jurisdiction of the Court of Appeals prescribed by Section 2418, Revised Statutes 1919.

I.  At the threshold of this appeal, we are confronted with two preliminary questions to be ruled before passing to the merits.  The first of these questions is raised by defendant's answer, which pleads that plaintiff corporation had not procured a license or certificate from the Secretary of State to do business in this State; **License to do Business.** that it was and is unlawful for said corporation to transact business in this State without a compliance with the statute (Secs. 9792, 9793, R. S. 1919) ; and that the contract sued on is therefore void, and, furthermore, plaintiff has no right to maintain this action in the courts of this State.  The point must be ruled against appellant.  It is admitted by the pleadings that plaintiff is a Minnesota corporation.  The evidence shows that plaintiff's business office and mill are at Minneapolis, Minnesota, and that so much of the Semolina flour as was delivered under the contract was manufactured at that place and shipped in carload quantities from there. A reading of the contract discloses that it was contemplated by the parties that all of the Semolina sold thereunder was to be milled in the foreign State.  Plaintiff had no office or place of business in this State, and, so far as the record shows, had no employees or stock of goods in this State.  While the contract appears to have been signed in this State, it was procured through a flour broker, who sold the flour on a commission basis and received no other compensation from plaintiff.  The broker maintained his office entirely at his own expense and sold the products of other millers than plaintiff.  Under the evidence before us, the contract was one involving interstate commerce and, so far as the record shows, plaintiff's business was confined to such interstate business.  It follows that the contract sued on is enforceable by plaintiff and plaintiff cannot be denied the right to maintain the instant action in the courts of this State.  [St. Louis to use v. Parker-Washington Co., 271 Mo. 229; International Textbook Co. v. Gillespie, 229 Mo. 397; Packing Co. v. Grocer Co.  193 Mo. App. 236; Corn Products Mfg. Co. v. Supply Co., 156 Mo. App. 110.]

II.  The other preliminary question involves the refusal by the trial court of defendant's request to be allowed to amend its amended answer at and during the trial of the cause.  The petition was filed and the action was commenced on June 9, 1921, and defendant filed an amended answer on April 19, 1922.  The parties went **Amending Answer.** to trial upon those pleadings on May 1, 1922.  On the second day of the trial, May 2, 1922, defendant's counsel asked leave to amend the amended answer by alleging therein "that the defendant could not read nor write the English language sufficiently to read the terms of the contract, either on the face or back, and relied solely upon the representations of plaintiff's agent, one C. W. Batty."  Plaintiff objected to the proposed amendment on

the ground of surprise, and also because the issues had been framed before the trial and the proposed amendment was a manifest attempt to introduce facts not in existence, and, if allowed, would make it necessary for plaintiff to ask for a continuance of the case, so that plaintiff could obtain evidence to meet the amendment. Whereupon, the trial court announced: "It appears that one of the witnesses, Mr. Yerxa, lives in Minneapolis and came here purposely to be a witness in this case, and has been in court two days, and I am informed was in Division No. 1, or rather in the city of St. Louis, since Tuesday, the 25th (of April) for the purpose of appearing in the case, and that he brought Mr. Hoidale, his counsel in Minneapolis, with him, to aid in the trial of the case, and that necessarily they have been put to the expense of railroad fare from Minneapolis to St. Louis, and will be put to that expense in returning, as well as hotel bills pending their waiting for the trial of the case. I am disposed to allow the amendment only on the terms that defendant will pay the expense, railroad fare and hotel expenses, of Mr. Yerxa and Mr. Hoidale on this trip." Defendant's counsel thereupon refused to pay the railroad fare and hotel expenses of Mr. Yerxa and Mr. Hoidale for the reason that such are not taxable as costs, but offered to pay the taxable court costs in the event that the amendment be allowed and the trial, because of surprise to plaintiff, shall be continued. Thereupon the court ruled: "I am of the opinion that it would be unjust to the plaintiff to allow the amendment and at the same time compel it to stand the expenses it has been put to because of the negligence of the defendant in failing to correctly plead its defense, and with the refusal of the defendant to pay these necessary expenses, the motion to amend the answer will be overruled." The trial then proceeded until the afternoon of May 3, 1922, when, plaintiff having closed its case in chief, defendant again asked leave to amend the amended answer and offered to submit to the terms announced by the court on the preceding day. Upon objection by plaintiff to the allowance of the amendment, the court stated: "Then I will overrule the application to amend the answer, in view of the fact that an opportunity was given yesterday on terms which the court considered just to the defendant, and the case having occupied another day's trial since that time." Appellant assigns error in these rulings.

The statute (Sec. 1274, R. S. 1919) provides: "The court may, at any time before final judgment, in furtherance of justice, *and on such terms as may be proper,* amend any . . . pleading . . . by inserting other allegations material to the case, or when the amendment does not change substantially the claim or defense, by conforming the pleading or proceeding to the facts proved."

While it has been repeatedly ruled by our appellate courts that the trial court, by virtue of the statute, should be liberal in allowing amendments in furtherance of justice, yet is has also been repeatedly ruled that it is discretionary with the trial court to disallow or deny the making of amendments, particularly when such amendments are offered out of time and during the course of the trial. Unless the trial court's discretion has been clearly abused, the appellate courts will not interfere. [Little River Drainage District v. Railroad Co., 236 Mo. 94; Laughlin v. Leigh, 226 Mo. 620; Clark v. Railway Co., 127 Mo. 255.] It appears from the record that defendant filed an amended answer on April 19, 1922, almost a year after the commencement of the suit on June 9, 1921, so that apparently it had ample time to plead all defenses which it deemed necessary to combat plaintiff's action. It waited, however, until after the trial had progressed for more than a day before offering the proposed amendment to its amended answer. One of plaintiff's officers and its counsel had come from Minneapolis, at considerable expense to plaintiff, in order to conduct the trial, and such expense would have been to no purpose had a continuance of the trial resulted by reason of the proposed amendment. We think that the terms offered defendant by the trial court were reasonable and in accord with the statute governing amendments to pleadings. The terms so offered were refused by defendant, but after the trial had proceeded for another day and plaintiff had closed its case, defendant offered to amend subject to the court's terms. We believe that the trial court did not abuse its discretion in refusing to allow the amendment to be made under the existing circumstances.

III. The validity of the contract in issue is assailed by appellant upon several grounds. Appellant claims that the contract is unilateral and lacks mutuality. It is clear, however, that the contract obligated plaintiff to manufacture and deliver to defendant 3,000 barrels of Two Star Semolina at the price of **Unilateral Contract.** $9.75 per barrel during the months of October, November and December, 1920, in such quanities and at such time as defendant might direct. Plaintiff had to be ready at all times to perform that contractual obligation on its part, for defendant was given the power to determine and fix, by shipping directions, the time of each shipment and the quantities to be shipped. Against this obligation, or promise, of plaintiff there was the promise or obligation on defendant's part to give shipping directions and to take and pay for the 3,000 barrels of Semolina at the agreed price. If the market price of Semolina advanced, plaintiff nevertheless was obligated to deliver the flour at the agreed contract price; on the other hand, if the market price of Semolina declined, defendant nevertheless was obligated to

give shipping directions and to take and pay for the flour at the agreed contract price. While it is true that the contract contains numerous other conditions and provisions, those conditions and provisions are incidental and collateral to the main obligations and purpose of the contract, namely, that plaintiff was to manufacture and deliver the flour at a stipulated price per barrel and that defendant was to order out and take the flour at that stipulated price. Defendant insists that there must be mutuality both as to the obligation and the remedy. Conceding the truth of that premise, it does not follow therefrom that the contract must afford the *same* remedy to each of the respective parties. In 13 Corpus Juris, 333, the rule is stated: "Mutuality does not require that the parties have the same remedies against each other." In Neola Elevator Company v. Kruckman, 185 Iowa, l. c. 1258, wherein it was claimed that a contract for delivery of corn was void for want of mutuality, that court said: "Contracts are not deprived of mutuality simply because one party thereto is granted privileges not given to the other. Their obligations need not be equal. The contract in question contained mutual promises and imposed mutual obligations, and is not, therefore, without consideration, or void for want of mutuality." Paragraph 5 of the contract before us affords a certain remedy to plaintiff in event of defendant's breach, whereas paragraph 4 of the contract affords a certain remedy to defendant in event of plaintiff's breach. In our opinion, the contract is not lacking in mutuality.

Appellant urges that the contract is a gambling contract and is therefore void because against public policy. The contract contemplated the manufacture, sale and delivery of a lawful commodity, Semolina flour, so that the purpose and object of the contract cannot be said to be unlawful or against public policy. It must be presumed, absent evidence to the contrary, that the parties entered into the contract with the intention of performing it and carrying out the mutual obligations imposed thereby. It follows, therefore, that we must indulge the presumption that plaintiff, in the inception and during the life of the contract, intended and expected to perform the contract by manufacturing the Semolina and making delivery thereof, at the times and in quantities as directed by defendant, until all of the Semolina contracted for was delivered. We cannot view the contract in the light of a gambling contract. The same point was urged as to a strikingly similar contract in Sheffield-King Milling Company v. Jacobs, 170 Wis. l. c. 404, wherein it is said: "It is suggested that, because the market price of No. 1 Northern wheat at Minneapolis is made the basis for computing the plaintiff's damages, the contract is therefore void as a gaming contract. (Citing cases.) There is, however, not the slightest intimation in the record that the

*Gambling Contract.*

parties at the time of making this contract did not intend to carry it out in accordance with its terms. In fact, every inference to be drawn from the conduct of the parties, both at the time of the inception of the contract and down to the time of its breach, indicates clearly and definitely that it was the intention of the parties to perform it. It is therefore a valid contract. The fact that the great market places of the world are made use of by gamblers in the conduct of an illegitimate and unlawful business does not alter the fact that organized markets are not only proper but necessary under modern conditions. They perform a valuable and serviceable function in the process of distribution, and there is no reason why prices etablished there may not be made the basis for adjusting contract rights. . . . The contract was in no way a gaming contract.''

It is urged by appellant that clause (a) of paragraph 2 of the contract, providing for extensions of the life of the contract for successive periods of thirty days each, and for as many **Successive** such successive extensions as the seller may desire, is **Extensions.** unilateral and unreasonable and caused defendant an unreasonable and unnecessary loss. It is true that the time within which defendant might have given shipping directions for the unshipped Semolina was extended, under the provisions of said clause, without specific notice to defendant, for three successive periods of thirty days each after December 31, 1920. Defendant, however, could have stopped any one or all of those extensions by ordering out, or giving directions to plaintiff to ship, the remainder of the Semolina. Furthermore, by the provisions of paragraphs 8 of the contract, defendant could have notified or informed plaintiff, in writing, that defendant would not perform the contract, or defendant could have directed or requested plaintiff to cancel the contract, in either of which events plaintiff, under the terms of said paragraph, was not entitled to more than one election or extension under clause (a) of paragraph 2 of the contract. On the other hand, the correspondence between the parties (in evidence) rather indicates that defendant at least acquiesced in the provided extensions of the contract, if in fact it did not impliedly request such extensions, for in defendant's letter dated November 19, 1920, it wrote to plaintiff: ''Our contracts have always been carried over in similar cases, and such procedure should be adhered to more so now under present market conditions over which we have no control.'' The parties made their own contract and we perceive no reason why they could not provide for extensions of the life of the contract, without further notice to defendant, if they saw fit to so agree at the time they made such contract. Such an agreement, so far as we know, violates no settled principle of law or public policy.

Finally, it is urged by appellant that the contract is so complex in its terms and conditions and is printed in such small type, closely spaced, that it cannot be understood by the ordinary mind and was not understood by defendant. But even so, such facts do not relieve **Complexity.** a party from a contract which he has seen fit to make, for he was not obliged to enter into such contract. Written contracts are not to be held void merely because of detail or complexity in their content, or because of the type or form of composition in which they are printed. As aptly said by SANBORN, J., in Railway Company v. Belliwith, 83 Fed. l. c. 439: "A written contract is the highest evidence of the terms of an agreement between the parties to it, and it is the duty of every contracting party to learn and know its contents before he signs and delivers it. He owes this duty to the other party to the contract, because the latter may, and probably will, pay his money and shape his action in reliance upon the agreement."

IV. Appellant insists that paragraph 5 of the contract, which provides that, by reason of buyer's breach of the contract, "seller shall recover from buyer liquidated damages as follows: (a) a sum equal to 4 cents multiplied by the number of bushels of wheat required to make such unshipped Semolina, figuring 4¾ bushels to the barrel of Semolina; plus (b) a sum equal to 3 cents multiplied by the said **Liquidated** number of bushels, which sum shall be calculated for **Damages:** each 30 days, or fraction thereof, intervening between **Penalty to** date hereof and date of breach; plus (c) amount of de-**Discourage** cline, if any, per bushel, multiplied by said number of **Breach.** bushels, from date hereof to date of breach, in highest closing price, at Minneapolis, of such wheat, such price to be, as to Durum (wheat) Semolina (if any), of Number 1 Amber Durum wheat," must be construed and held to be a penalty rather that a lawful provision for liquidated damages.

The question whether a sum, or method for the calc lation of such sum, named in a contract to be paid by the defaulting party upon its breach, is to be considered liquidated damages or merely a penalty, is always a vexatious and troublous one for the courts, and ordinarily is not one which is easy of solution. No hard and fast general rules for the determination of such question can be, or have been, laid down as applicable to all contracts, but each case or contract must be ruled largely upon its own peculiarities and particular facts. The question is one to be determined by the contract, fairly construed, and, in arriving at a determination, the courts will seek to arrive at the intention of the parties from a consideration of the contract, as a whole, the situation of the parties, the subject-matter of the contract and all the circumstances surrounding its execution, together with

the ease or difficulty of measuring the breach in damages, and the magnitude of the stipulated sum, not only as compared with the value of the subject of the contract, but in proportion to the probable consequence of the breach.   [17 C. J. 936.]   Neither is the name or designation given by the parties to the sum specified in the contract, nor the language or particular words used by the parties, conclusive as to whether the parties intended to provide for liquidated damages or for a penalty.

In the early case of Morse v. Rathburn, 42 Mo. 594, Judge Wagner, speaking for this court, said: "It is perfectly competent for parties, when entering into an agreement, to avoid all controversy as to the amount of damages which may result from a violation of the contract, and to agree upon a fixed, certain and definite sum which shall be paid by the party in default. The damages in such a case are termed liquidated, stipulated or stated damages. . . . Where the parties to a contract, in which the damages to be ascertained growing out of a breach are uncertain in amount, mutually agree that a certain sum shall be the damages in case of a failure to perform, in language plainly expressive of such agreement, and when the intention is plain and palpable, there is no law, that I am aware of, to justify the courts in giving the contract a different construction or saying that the parties meant something else. Where the sum fixed is greatly disproportionate to either the actual or presumed damage, showing that one side was the victim of oppression, a court exercising equity powers would interfere."

In May v. Crawford, 150 Mo. 531, this court stated the matter thus: "The sum of the whole matter is that where the contract is one touching a legal subject-matter, the parties *sui juris* and the damages for a breach can be computed with certainty by definite rules, the courts will construe it to be a penalty; but where from the nature of the contract the damages cannot be calculated with any degree of certainly or any attempt to get the actual damage would be difficult, if not vain, or where 'the exact damage is not susceptible of definite ascertainment,' or where the acts to be done or admitted 'are not measurable by any exact pecuniary standard, and the intention of the parties 'is plain and palpable,' and the amount stipulated in the contract as the damages to be recovered is not 'disproportionate to the probable damages,' the courts will construe it to be liquidated damages."

The Federal Supreme Court, in United States v. Bethlehem Steel Co., 205 U. S. 1. c. 119, has said: "The courts at one time seemed to be quite strong in their views and would scarcely admit that there ever was a valid contract providing for liquidated damages. Their tendency was to construe the language as a penalty, so that nothing but the actual damages sustained by the party aggrieved could be re-

covered. Subsequently the courts became more tolerant of such provisions, and have now become strongly inclined to allow parties to make their own contracts, and to carry out their intentions, even when it would result in the recovery of an amount stated as liquidated damages, upon proof of the violation of the contract, and without proof of the damages actually sustained.''

Similar contracts for the manufacture, sale and delivery of flour have been construed in other jurisdictions and are held to properly provide for the payment of liquidated damages rather than the imposition of a penalty. In Erie Baking Company v. Hubbard Milling Co., 217 Fed. 759, the Circuit Court of Appeals, 3rd Circuit, speaking through McPHERSON, Circuit Judge, said:''The only controversy upon this writ of error is about the proper measure of damages. At the time the contract was made the Milling Company did not have the flour on hand, so that the parties agreed, not upon the sale of an article already made, but upon the manufacture and sale of an article not yet in being. For the breach of such a contract it is apparent that the measure of damages generally applied—namely, the difference between the price agreed upon and the market price at the time of breach—may not properly compensate the manufacturer, and in that event another measure that will compensate him should be applied. What the measure is to be will depend on the facts of the particular case. The evidence here shows that the Milling Company went into the market immediately upon the making of the contract and bought wheat for future delivery in sufficient quantity to meet its obligation, and when the Baking Company unlawfully broke the contract this raw material was either in the Milling Company's possession or was to be delivered under agreements that had already been made and were only awaiting execution. When the cancellation of the contract was announced, the price of wheat had gone down, and for this loss—9½ cents a bushel—the Baking Company was properly charged.''

In Sheffield-King Milling Company v. Baking Company, 95 Ohio St. 180, the contract provided, as the basis of settlement of damages in event of breach by buyer, ''the actual difference between the highest closing price of No. 1 Northern wheat in Minneapolis on the date of sale and date of cancellation as shown by the 'Minneapolis Market Record,' figuring four and one-half bushels of wheat for every barrel of flour, the buyer to reimburse the seller for carrying the wheat at the rate of one cent per bushel per month from date of sale to date of cancellation, plus two cents per bushel for buying and reselling the wheat, and two cents per bushel to cover loss of profit, if any, and inconvenience to seller resulting from failure of buyer to take out flour as per contract.'' The defendant buyer claimed that the foregoing provision of the contract amounted to a penalty. Said the court in

ruling the point: "In the case at bar it is contended that the article contracted to be sold was an ordinary commodity whose market value was easy to be ascertained, and that the measure of damages for the breach of a contract of sale is the difference between the contract price and the market price at the place of delivery. This is, of course, the general and well-settled rule in the absence of valid provisions in the contract which require the application of a different measure. . . . We think that a consideration of the whole instrument forces the conclusion that the contract did not provide for, and the parties did not contemplate, a direct sale of the flour as an ordinary commodity, as it might have done if the parties had so desired; but it provided for, and they contemplated, the purchase of the wheat at once and the future manufacture and delivery by the plaintiff of the amount of flour within the period covered by the terms of the contract. With these steps in contemplation, the parties contracted that defendant should reimburse plaintiff for any loss on account of the purchase of the wheat in case defendant refused to take the flour, or 'fails to furnish directions for shipment.' The parties in this case were fully competent to contract. Each was fully able to consider and provide for his own interest. It is not claimed that there was any fraud or circumvention in connection with the negotiation, and we can conceive of no injustice, or inequity, in the enforcement of the terms of a contract thus made, which contemplated the purchase by the seller of sufficient wheat to supply the commodity to be manufactured and delivered thereafter during a period of a number of months. The parties agreed that wheat, the thing from which the flour was to be made, should be the basis upon which to calculate damages. They could, of course, have agreed that the flour should be such basis, but they did not do so. That was a matter for them to agree about. They did not fix an arbitrary lump sum which might turn out to be wholly inequitable, but fixed a method, the chief element of which was the price of wheat from which the flour was to be made, a matter not within the control of either. In this situation when the plaintiff proved it had performed the terms of the contract on its part, had purchased the necessary wheat, and showed the damages that had accrued on the basis agreed on, it was entitled to recover."

An almost identical form of contract was construed in Sheffield-King Milling Company v. Jacobs, 170 Wis. 389, wherein it is said: "The intent of the parties in this case is made clear by the recitals of the contract itself, and particularly so when they are considered in relation to the complicated and complex situation with which the contract deals. The contract is not one for the sale and delivery of an article to be procured in the open market and delivered to the purchaser. It is a contract for the manufacture of a commodity from a

basic raw material. Actual damages could not therefore be established by showing the difference between the contract price of Gold Mine flour and the market price, assuming that it had an established market price. The inquiry would therefore involve purchase and storage of wheat, cost of manufacture into flour, and many other subsidiary questions. . . . Where such contracts are entered into, which are fairly within established legal principles, it is not the business of the courts to interfere and attempt to set aside such stipulations, as has often been done with the result that, while theoretical legal justice may be attained, as a practical matter justice is denied. There is no reason why courts should regard with paternalistic solicitude the situation of a party who has deliberately broken his contract. . . . Parties to contracts are, as a rule, very much more familiar with the subject-matter with which the contract deals, the conditions under which the contract is to be performed, than courts and juries can possibly be, and where they attempt in a fair way to agree upon a method of computing damages in case of breach by either party they are much more likely to arrive at a just result than is court or jury upon a trial. See Sun P. & P. Assn. v. Moore, 183 U. S. 642; United States v. Bethlehem Steel Co., 205 U. S. 105; 1 Sutherland, Damages (4 Ed.) sec. 283, p. 842; Knox Rock Company v. Grafton Steel Co., 64 Ohio St. 361. . . . It is apparent that at the inception of the contract the probable damages which the plaintiff might suffer in the event of a breach by the defendant would be difficult of ascertainment and uncertain. The parties agreed upon a fair basis of computation, and, while the amount recovered is large, great variations in the market price of wheat and flour must have been anticipated by the parties, and in view of all the circumstances the amount recovered is not unconscionable.''

To like effect is the ruling in New Prague Flouring Mill Company v. Grain and Provision Co., 226 Mich. 35.

The contract before us clearly indicates that the parties contemplated the subsequent manufacture of the flour, for it is provided in paragraph 9 that ''this is a contract to sell, by description, *goods to be manufactured.*'' Of course, the flour necessarily was to be manufactured out of a basic raw material, wheat. Plaintiff's evidence is to the effect that, according to its uniform and invariable custom, it purchased, immediately upon the signing of the contract, an option for the future delivery of a sufficient quantity of wheat to enable it to perform its obligation under the contract. It was shown by plaintiff's testimony that the contract price of the Semolina flour, $9.75 per barrel, was based upon the current price of wheat on the very date of the flour contract. In other words, plaintiff ''hedged'' or protected itself upon its contractual obligation against a possible rise or increase in the price of wheat, the basic raw material out of which it

must subsequently manufacture the flour. It is a fact well known to the milling and baking trade, and to the ordinary consumer, as well, that the price of wheat fluctuates from day to day and that the price of wheat at any future date cannot be determined or foretold with any degree of certainty or accuracy. The custom of plaintiff in purchasing wheat for future delivery to meet its outstanding and unfilled flour contracts would therefore appear to be founded upon sound business judgment and common sense. Otherwise, plaintiff might stand to suffer a heavy loss, perhaps financial ruin, due to rise in the price of wheat. While there is some uncertainty in the evidence whether the options purchased by plaintiff on October 5, 1920, called for the future delivery of No. 1 or No. 2 Durum wheat or whether they called for delivery of another grade or kind of wheat, nevertheless the evidence does tend to show that in the event of a rise or decline in the price of any particular grade or kind of wheat, whether optional or cash wheat, there is a relative and proportionate rise or decline in the price of all other grades or kinds of wheat. The evidence furthermore tends to show that plaintiff, from time to time, sold the options it had purchased for future delivery of wheat and converted them into cash wheat for immediate delivery, and that, as a practical matter, it is impossible to preserve the identity of any particular wheat purchased or trace such wheat into any particular flour contract. It may have been, as defendant strongly urges, that all of the options purchased by plaintiff on October 5, 1920, were subsequently converted into cash wheat and ground into flour which was delivered to other customers than defendant, yet the fact remains, supported by the evidence, that plaintiff was, at all times and on every day, completely "hedged" against its unfilled flour contracts, either by the purchase of optional wheat for future delivery or by cash wheat in its bins, and that at all times between October 5, 1920 (the date of contract with defendant) and April 1, 1921, the date of cancellation, plaintiff had in its bins or in its possession a sufficient quantity of Amber Durum wheat to have manufactured the unshipped 2030 barrels of Semolina under said contract. The question whether "plaintiff had on hand from and including October 5, 1920, at all times to and including April 1, 1921, sufficient wheat, either in its possession, or for which it had contracted, to enable plaintiff to perform its part of the contract" was submitted to the jury as one of fact by plaintiff's given Instruction 1, while defendant's given Instructions 6 and 7 charged the jury, in substance, that if plaintiff did not purchase, on October 5, 1920, wheat to cover the contract and did not have sufficient wheat in its possession, or under contract for delivery to plaintiff, for the performance of its contract with defendant, and did not, on or about April 1, 1921 (the date of cancellation), sell said wheat, or option for same, purchased against said contract, then their verdict should be for plaintiff for

315 Mo.—61.

nominal damages only. The verdict and finding of the jury upon those questions of fact, submitted by both plaintiff's and defendant's instructions, is conclusive and binding upon this court on appeal.

. · The parties having contemplated, as indicated by the language of their contract, that the flour was to be subsequently manufactured, and it appearing that, in order to manufacture and deliver the flour at future dates to be determined by defendant's shipping directions, plaintiff must necessarily purchase the basic wheat from which to make the flour, the price of which wheat might rise or fall from day to day during the life of the contract, it would seem to follow that the parties had the unquestionable right to agree upon some reasonable method of determining their respective damages in event of a subsequent breach of the contract by either party. This they have done by paragraph 4 (which measures buyer's damages) and by paragraph 5 (which measures seller's damages), respectively, of their contract.. The damages sustained by plaintiff (seller) depended largely upon the decline in ·the price of wheat, the cost of carrying such wheat, the cost of the purchase and resale of the wheat, the overhead or cost of maintaining its mill and organized force of skilled employees in the event of a temporary shut-down due to lack of shipping directions on the part of defendant, and the prospective profit it would have made had the flour been manufactured and delivered, none of which elements of damage (unless it be the decline in the price of wheat) is susceptible of any accurate or definite determination. One of plaintiff's officers testified (not for the purpose of fixing plaintiff's exact damage, but for the purpose of showing .that the agreed method for calculating liquidated damages is reasonable) that plaintiff's damage, because of defendant's breach, was approximately $7,910, subject to a variation of $1,500 to $2,000. While plaintiff's recovery is large, we cannot say as a matter of law, under the facts in evidence, that the recovery is grossly disproportionate to the actual or probable. damages sustained by plaintiff or that the method for calculating liquidated damages agreed upon by the parties is unconscionable or indicative that the sum to be so calculated was intended as a mere penalty to discourage or prevent a breach on defendant's part.

V. Appellant assigns error in the exclusion of evidence offered in support of its counterclaim and because the trial court peremptorily charged the jury to find for plaintiff upon the counter-

**Counterclaim:
Conditions
Precedent.**

claim. The contract (paragraph 7) provides that acceptance of the flour shipped thereunder shall estop defendant (buyer) from claiming damages, misrepresentation, fraud, defect in quality, or other breach or default, as to such goods, and that the whole of any shipment shall be deemed to

have been accepted by the buyer, if buyer fails to report such defect, breach or default to seller's office, by registered mail, in writing, over buyer's signature, before expiration of ten days after receipt of shipment and payment of draft, or if buyer fails to send to seller's office, by express, within such ten days, a five-pound sample of goods claimed to be defective or inferior, or if buyer fails to transmit to seller's office, by registered mail, a signed, verified and itemized statement of claim for damages before expiration of thirty days from receipt of the shipment on which the claim is made. Those requiremen;s were conditions precedent, agreed to by the parties, to be complied with by defendant before recovery of damages could be had by defendant. Defendant, by its answer and counterclaim, pleaded neither a compliance with said conditions of the contract on its part nor the waiver by plaintiff of a compliance therewith by defendant. The record shows that no claim for damages, because of alleged inferiority of the flour or otherwise, was made by defendant until its letter of March 16, 1921, which was more than thirty days after the receipt by defendant of the last shipment, and the payment of the draft therefor, on February 1, 1921. Besides, that letter (or claim, if it was so intended) was not verified by defendant, and the letter intermingled a claim based on the flour contained in the first shipment (received by defendant and paid for on December 4, 1920) with a claim based on the flour contained in the third or last shipment. No five-pound sample of the flour contained in any of the three shipments was shown to have been sent by defendant to plaintiff, by express, although there is some evidence that plaintiff received, within ten days after the payment of draft, a sample of flour contained in the third shipment. It has been repeatedly ruled that similar contractual obligations are conditions precedent to be observed and performed by the buyer, and he must show a compliance therewith on his part, or a waiver thereof by the seller, before he can recover damages from the seller or hold the seller upon a warranty, express or implied, as to the quality or fitness of the goods delivered by seller. [Nichols, Shepherd & Co. v. Larkin, 79 Mo. 264; Machine Co. v. Wells, 182 Mo. App. 50; Gaar-Scott & Co. v. Nelson, 166 Mo. App. 51; Nichols-Shepard Co. v. Rhoadman, 112 Mo. App. 299; Boyer v. Neel, 50 Mo. App. 26; Deere, Mansur & Co. v. Hucht and Fierling, 27 Mo. App. 1; Bank of Fitchburg v. Westlake, 21 Mo. App. 565.] Appellant relies upon Ungerer & Company v. Cheese and Fish Company, 155 Mo. App. 95, in support of its position, but a careful reading of that opinion discloses that the contract of sale there considered contained no such requirements, or conditions precedent, to be complied with by the buyer. In our opinion, no error was committed by the trial court in excluding evidence of inferiority of the shipped flour,

proffered under defendant's answer and counterclaim, or in directing the jury to find for plaintiff upon the counterclaim.

VI. Appellant assigns error in the giving of plaintiff's Instruction 2, to the effect that "even if you find and believe from the evidence that the 970 barrels of Semolina actually **Severable** delivered to defendant by plaintiff were not of the **Installments.** quality called for by the contract, nevertheless that fact would not of itself justify defendant in refusing to take and pay for the remaining 2030 barrels of Semolina under said contract."

Paragraph 7 of the contract provides: "In event there is more than one installment of goods shipped or stipulated herein to be shipped, *contract shall be severable as to each installment shipped* or stipulated herein to be shipped . . .; *nor shall seller's breach or default as to any installment give buyer right to refuse any other installment.*" We know of no principle of law which prevents the parties from agreeing that a contract shall be severable as to each installment of goods shipped or delivered thereunder, provided that it be clear (as here) that such is the intention of the parties. In 13 Corpus Juris, 562, it is said: "Primarily the question whether a contract is entire or severable is one of intention, *which intention is to be determined from the language which the parties have used* and the subject-matter of the agreement." The parties here have agreed, in no uncertain language, not only that the contract shall be severable as to each installment of flour shipped, but that seller's breach or default as to any installment shall give the buyer no right to refuse any other installment. Under such circumstances, it has been held that the buyer has no right to rescind the contract or refuse subsequent shipments on the ground that prior shipments or installments were inferior in quality or unfit for the use intended. [Habicht, Braun & Co. v. Gallagher & Co., 172 Mich. 328, 137 N. W. 685; Ellison, Son & Co. v. Grocery Co., 69 W. Va. 380, 71 S. E. 391; Cahen v. Platt, 69 N. Y. 348; Krebs Hop Co. v. Livesley, 59 Ore. 574, 114 Pac. 944.] In view of the aforementioned expressed intention and agreement of the parties, the trial court did not err in giving plaintiff's Instruction 2.

VII. Other alleged errors are assigned. General complaint is made of the instructions given on behalf of plaintiff and the refusal of instructions asked by defendant. We perceive no error in the giving and refusal of instructions.

The trial court excluded defendant's offer of proof to the effect that the salesman, Charles W. Batty, stated to John L. Randazzo, at the time the contract was signed, "that the printed matter on the

**Misrepresentations.** back of the contract was not a part of the contract, but was the rules and regulations of the (plaintiff) company.'' Defendant's offer of proof does not show, however, that Randazzo relied upon Batty's statement or acted thereon in signing the contract, nor does the offer of proof show that Batty said or did anything to prevent or dissuade Randazzo from reading the contract before he signed it. Although a duplicate signed copy of the contract was left with defendant at the time it was signed, the record does not show that defendant, at any time, complained to plaintiff that the contract was procured or signed through any misrepresentation or fraud on the part of either plaintiff or the salesman Batty. The offer of proof, in our judgment, was insufficient to show fraudulent intent on the part of plaintiff or Batty, or that defendant, in signing the contract, acted and relied on Batty's statement, conceding that Batty made such statement at the time. We think that the offer of proof was rightly excluded.

Defendant, apparently for the purpose of showing a substantial compliance on its part with the terms of the contract respecting notice of inferiority of the goods shipped, offered in evidence a **Carbon Copy of Letter.** carbon copy of a letter claimed to have been sent by it to plaintiff on December 10, 1920 (which letter defendant offered to prove was deposited in the mails on that date), acknowledging delivery, on December 4, 1920, of the first car of Semolina and complaining of the quality of that shipment and stating that defendant was sending plaintiff a one-pound sample of the Semolina for its inspection. The record does not show that plaintiff admitted having received either the letter or the sample referred to therein, nor does defendant's evidence tend to establish the receipt thereof by plaintiff. The contract provides that all defects in goods shipped shall be reported by *registered* mail and that samples of goods claimed to be inferior or defective must be sent to plaintiff by express. The evident purpose of this requirement of the contract was to furnish a clear and indisputable method of proving, by the records of the post office department and the express company, the transmission and delivery of such notice and sample to plaintiff. The court offered to receive defendant's proof of the contents of the letter and that a sample of flour was sent at the same time, provided defendant offered proof that the letter was registered and the sample sent by express. Defendant failing to supply that evidence, the offer of the carbon copy of the letter in evidence was rejected. The trial court's ruling was proper, in the absence of an admission by plaintiff of receipt of the letter and sample, or substantial proof by defendant that plaintiff did receive the same.

It is also claimed that the contract was modified by reason of the inclusion of one hundred barrels of Three Star (instead of Two

Star) Semolina in the third shipment, and therefore 'plaintiff must found its recovery on another and modified contract and **Modification.** not on the original contract of October 5, 1920. But the parties had agreed that the original contract shall be severable as to each installment shipped; hence, the original contract stands unmodified as respects the 2030 barrels of Semolina remaining unshipped on April 1, 1921, the date plaintiff treated the contract as breached by defendant. The basis or foundation of plaintiff's recovery is the contract of October 5, 1920, which, by its terms, is severable as to the unshipped flour and is unaffected by any modification or change respecting any prior shipment.

We find no reversible error in the record before us and the judgment *nisi* is accordingly affirmed. *Lindsay, C.,* concurs.

PER CURIAM:—The foregoing opinion by SEDDON, C., is hereby adopted as the opinion of the court. All of the judges concur, except *Graves, J.,* absent.